

December 4, 2024

**VIA ECF**

**J. Bruce Maffeo**
Direct Phone 212-883-4951
Direct Fax 917-521-5866
jbmaffeo@cozen.com

**Andrew D. Linz**
Direct Phone 215-366-4453
Direct Fax 215-253-6792
alinz@cozen.com

Honorable Ann M. Donnelly
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**Re: United States v. Leticia Smith et al.
Criminal Docket No.: 22-464 (AMD)**

Dear Judge Donnelly:

I represent Dr. Somsri Ratanaprasatporn ("Ratanaprasatporn" or the "defendant") in the above-referenced matter and submit this letter in advance of her sentencing on December 18, 2024. As argued more fully below, the defense respectfully submits that a non-custodial sentence is appropriate given the defendant's advanced medical condition, her commendable personal and professional history and the relevant facts surrounding her involvement in the charged scheme.

Procedural History

On October 11, 2022, Ratanaprasatporn and seven other defendants were arraigned on a multi-count indictment charging them with conspiracy to distribute oxycodone and related offenses. Ratanaprasatporn, who is a 77 year-old physician[1] with no prior criminal record, was released on bail and has been fully compliant with all conditions imposed as part of her release. Based on the volume of discovery anticipated by the government, Your Honor designated the case as complex, and over the ensuing months, the government produced a wealth of documents, including patient files and materials secured either by search warrant or from court authorized intercepts over two months of electronic surveillance. After reviewing the discovery, the defense entered into discussions with the government regarding an appropriate disposition of Ratanaprasatporn's case that ultimately resulted in a plea agreement whereby she would plead guilty to Counts 8 and 9 of a superseding indictment, *viz.*, obstruction of justice, in violation of 18 U.S.C. §§ 1512(c)(1) and 1512(k), and conspiracy to use a registration number issued to another, in violation of 21 U.S.C. § 846. Based on a review of the discovery and discussions with her family that raised concerns

---

[1] After the filing of the indictment, Ratanaprasatporn voluntarily agreed to the suspension of her license to practice medicine. As required by her plea agreement with the government, she also has voluntarily surrendered her DEA license.

with the defendant's mental capacity, defense counsel retained the services of Dr. Sejal K. Vyas, an experienced and qualified neuropsychologist who specializes in the diagnosis and treatment of cognitive decline in high-achieving individuals. Dr. Vyas conducted a full examination of Ratanaprasatporn, including taking an extensive personal and medical history and submitting her to a battery of tests.[2] Based on her examination, Dr. Vyas concluded:



Report of Sejal K. Vyas, PH.D. ("Vyas Report").[3]

The defense and government subsequently informed the Court of the proposed plea agreement and provided a copy of Dr. Vyas's report. After the Court expressed its own concerns whether the defendant was capable of entering a knowing and voluntary plea, the government requested an opportunity to have their own expert examine the defendant. The government's expert substantially agreed with Dr. Vyas's findings but concluded that the defendant was nonetheless capable of understanding the charges against her and the relative risks and benefits of pleading guilty. Armed with both of these reports, the Court scheduled a plea hearing for August 6th at which Your Honor conducted a searching inquiry of the defendant during her allocution and accepted her plea.

The Offense Conduct

Counsel has reviewed the presentence report ("PSR" or the "Report") with both the defendant and her family. While the defense respectfully disagrees with the accompanying sentencing recommendation and in particular its statement that Ratanaprasatporn, "along with co-defendants, collectively profited millions of dollars," the Report itself is impressively detailed and accurate in the main in its description of the offense and the defendant's personal and professional history.[4]

---

[2] In addition to Dr. Vyas's cognitive findings, Ratanaprasatporn also suffers from a myriad of other health issues, which are detailed in the Report. PSR. ¶¶ 57-60.
[3] Although the Court was already provided with a copy of Dr. Vyas's report, for ease of reference, an additional copy of Dr. Vyas's report is attached as Exhibit A to this submission.
[4] The few factual errors are for the most part trivial and easily resolved. For example, the PSR lists the name of Aroowan Ratana as an alias (PSR, at p. 2). The defendant notes that this is the name of her deceased husband's first wife. The defendant's son, John, formerly was employed as a graphic designer but is now involved in real estate development (PSR, ¶ 53). Her vehicle, a 2012 BMW 750i recently broke down and has been junked (PSR, ¶ 70), and the $20,000 in miscellaneous monthly expenses is attributable to legal fees incurred in this case (PSR, ¶ 71). More substantively, as described *infra,* the Probation Office's sentencing recommendation erroneously suggests that the defendant shared in the millions of dollars reaped by co-defendants Smith, Kent, Walker and Mathis. In fact,

Footnote continued on next page

The defense also agrees with the Report's guidelines calculation, which results in a Total Offense Level of 27 and a corresponding advisory guidelines range of 70 to 87 months and mirrors that agreed to by the parties in the plea agreement. PSR, ¶¶ 22-42; 77.

The Report generally describes the relevant facts underlying the two counts to which Ratanaprasatporn pleaded guilty. PSR, ¶¶ 6-20. The evidence in support of the unauthorized access charge is undisputed given that the defendant, at the time a licensed physician who was functionally computer illiterate, provided co-defendant Letitia Smith, her longstanding receptionist, unfettered access to her DEA credentials thereby enabling Smith to file prescriptions electronically. The facts surrounding the obstruction charge however are more complex and merit further discussion.

On October 3, 2022, DEA agents interviewed Ratanaprasatporn at her home and asked about oxycodone prescriptions recently issued under her DEA credentials for a patient named Ronald Capers, who had died three years earlier. In telephone conversations intercepted pursuant to a Title III warrant, Ratanaprasatporn then called Smith to inquire about the prescriptions issued to Capers. Smith initially disclaimed any memory of Capers ("I don't know. I gotta look at his chart") (EDNY004881), however within the hour called co-defendant Raymond Walker, who had purchased oxycodone prescriptions in Capers' name, to ask him about Capers (EDNY004887-89). In a series of follow-up calls with Ratanaprasatporn later that day, Smith continued to dissemble regarding her knowledge of Capers, suggesting that either a family member had picked up the prescriptions, or, alternatively, because the prescriptions had been issued during the Covid pandemic, someone posing as Capers had picked them up while wearing a mask: "That means somebody in his family was tricking. . . . And, you know everybody got a mask on. Everybody got a mask on. . . . So they tricking.) (EDNY004442). In another intercepted conversation, after a discursive discussion in which Ratanaprasatporn complained about, among other matters, surgeons' abandonment of post-operative care for their patients,[5] the defendant instructed Smith to ensure that going forward she take a photocopy of every patient's identification when they came to the office seeking refills of their prescriptions. Smith resisted the suggestion, asking whether it would "look funny" to begin the practice after the DEA had inquired about Capers, at which point Ratanaprasatporn told her to make the notation after the patient's first visit, thereby falsifying the medical records (EDNY004444-45). The latter conversation provides the basis for her plea of guilty to the obstruction charge.

While the PSR captures the essence of Ratanaprasatporn's culpability for the two charges to which she pleaded guilty, it fails to take into account the import of conversations, such as those cited above, that demonstrate the lengths to which Smith went to conceal from Ratanaprasatporn her involvement in the illegal sale of oxycodone prescriptions, whether issued to Capers or other

---

Ratanaprasatporn, as evidenced by the forfeiture component in her plea agreement, derived a profit, such as it was, of approximately $100,000, comprised solely of the $10 fee she routinely charged patients for refilling prescriptions.

[5] For instance, Ratanaprasatporn complained that surgeons would expect primary care physicians (PCPs) like herself to handle the aftermath of an operation ("Leave the orthopedic, leave the surgery let them follow ten years, twenty years . . . . Did the surgery and send the patient out to the PCP. You don't know what they did.") (EDNY004442), and related the pain and rough treatment she felt after undergoing a cesarian section operation herself ("Because he stitched pretty rough. He pulled it so tight after the surgery I have so much pain. . . . My God, you don't know. They just say, 'Suture is suture." You know?) (EDNY004442).

patients. Smith first began to work part-time for Ratanaprasatporn as a teenager and resumed working for her after retiring from the New York City Department of Sanitation. During her interview by DEA agents, Ratanaprasatporn expressed her trust for Smith, including, ironically, her reliance on Smith's knowledge of the area to ward off suspected drug dealers. Texts and intercepts provided by the government reveal that Ratanaprasatporn, who frequently was absent from the office, effectively delegated to Smith the day to day management of her practice, including fielding inquiries from legitimate patients and electronically transmitting prescriptions for all types of medication, both narcotic and non-narcotic. Ratanaprasatporn's total dependence on Smith was vividly captured in one iMessage dating back to 2019 where she wrote: ███ ███ .

The government's discovery also documented the extent to which Ratanaprasatporn's trust in Smith was grossly misplaced. Smith alternately complained about the nominal pay she was receiving and gossiped about the decline in Ratanaprasatporn's mental and physical condition. For example, in a series of texts beginning in late 2017 between Smith and another former employee of Ratanaprasatporn's, who appears to have been complicit in Smith's scheme, Smith mocked the doctor's inability to access a computer ███ and exchanged one picture of her falling asleep at her desk at work ███ and another of a car crash that Ratanaprasatporn recently had been involved in ███ In a recurring theme, the two also complained about how Ratanaprasatporn's unexpected appearance at the office had deprived them of the opportunity to conduct illegal sales ███

Ironically, Smith's interactions with the defendant, and her observations of the decline in Ratanaprasatporn's mental condition, comport with the findings in Dr. Vyas's report. ███ Vyas Report at 3 (citation omitted).)[6] Additional evidence of the defendant's decline is found in the accounts of her adult children in their letters to the Court, copies of which are included in Exhibit B to this submission, and in particular the probation officer's interview of her eldest child, Dr. Richard Ratanaprasatporn, who dates the onset of his mother's decline to over 10 years ago after which she stopped filing taxes and recently fell prey to a scam in which she was defrauded of approximately

---

[6] ███

$50,000.[7] PSR, ¶ 54. ███████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████ For example, a review of the 200+ oxycodone patient files that were seized from Ratanaprasatporn's office reveals that, while for the most part she conducted appropriate physical examinations that initially supported the prescription, they were refilled for months on end without any apparent evidence of follow up examinations other than notations by the defendant of the receipt of her traditional fee of $10 for refilling prescriptions.[8] Unbeknownst to Ratanaprasatporn, however, Smith collected approximately $200 for the sale of each oxycodone prescription, with Kent, Walker and Mathis collecting additional sums from their street sale of the medication. The discrepancy between the streams of payment to Smith, Kent, Walker and Mathis, and Ratanaprasatporn's de minimis co-payments is graphically demonstrated by the staggering amounts of cash seized during search warrants executed at the residences of Smith and Kent, collectively approximating upwards of $1,000,000, compared to the seizure of approximately $44,000 in cash taken during a search of the defendant's home, a figure that almost certainly included cash co-pays collected by her for non-oxycodone patients.[9]

---

[7] As noted in the PSR, the defendant has retained an accountant to file tax returns for the years in question. Draft returns have been prepared for the years 2014-2016, and once filed, returns for the remaining years will be prepared and filed.

[8] Ratanaprasatporn's prescription practices, as reflected in these 200+ patient files, provide a clear illustration of the rigidity of thinking and perseveration with which Dr. Vyas was concerned. The prevailing medical norms for prescription of opioid pain medication, including oxycodone, have undergone a radical revolution in the past 15 years. The long-term administration of opioids for chronic pain was once commonplace; the medical community's evolving understanding of the impacts of such practices has led practitioners to sharply curtail the use of opioids. *Compare* Denise Boudreau, et al., *Trends in Long-term Opioid Therapy for Chronic Non-cancer Pain*, 18 PHARACOEPIDEMIOLOGY & DRUG SAFETY 1166 (2009) (describing the increasingly prevalent long-term use of opioid therapy between 1997 and 2005) *with* Deborah Dowell, et al., *CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016*, 315 JAMA 1624 (2016) (relating the CDC's conclusion that "[o]pioids were associated with increased risks, including opioid use disorder, overdose, and death, with dose-dependent effects" and recommendation to prefer nonopioid therapy wherever possible) *and* Deborah Dowell, et al., *Prescribing Opioids for Pain — The New CDC Clinical Practice Guideline*, 387 New England J. Med. 2011 (2022) (reaffirming the 2016 guidance that "clinicians maximize the use of nonopioid therapies"), copies of which are attached hereto as Exhibit C. Ratanaprasatporn's regular, long-term prescriptions of opioid medications are entirely consistent with the prevailing standard of care of a decade or more ago. Despite the intervening changes, however, her practices and thinking remained stuck in the past. Indeed, Ratanaprasatporn's complaints about surgeons' inadequate post-operative care, *see supra* n.5, are best understood as an expression of this rigid thinking: patients are no longer discharged from surgery with substantial opioid prescriptions as they once were. *See also* Letter from Dr. Richard Ratanaprasatporn at 1 ("Unfortunately, the field of medicine and its advancement, particularly the reliance on technology, has made her practice of medicine obsolete.")

[9] The plea agreement includes a forfeiture of the defendant's half-interest in the medical office as well as $105,410, a figure calculated by the $10 charge associated with each oxycodone prescription and which includes the $44,470 and $1,040 in cash seized from the defendant's home and office, respectively. She will tender payment of that amount before sentencing. Based on an independent appraisal, the office has an estimated market value of approximately $500,000, and the defendant has received two offers substantially in excess of that, which she is waiting to be formalized.

The Defendant's Personal History

The instant case brings to a tragic end the defendant's otherwise remarkable history of personal and professional achievement, which are summarized in the relevant sections of the PSR. Born in 1947, the defendant was the youngest of eight children and raised under modest circumstances. A brilliant student, she was one of the first women to graduate from medical school in Thailand. In 1978, Ratanaprasatporn emigrated to the United States with her husband, also a physician. She and her husband were licensed to practice medicine in the United States and practiced together in the same Linden Boulevard location for years before his death in 2007. Over the years, she has been the recipient of numerous awards for her service to both the Brooklyn community in which she practiced as well as the Thai American community in which she remains active. She raised four children, three of whom are also medical doctors. (PSR, ¶¶ 50-56; 65).

This skeletal history is fleshed out in the letters submitted to Your Honor from her adult children and others, which, as previously noted, are annexed as Exhibit B to this submission. The common theme that runs through all of them is that of a dedicated physician who devoted herself to the care of the underprivileged population of East New York and the broader Thai community in metropolitan New York while at the same time successfully raising four children, three of whom have followed their parents in becoming physicians. In a letter jointly written by her twin daughters, Linda and Lisa, they describe their upbringing as follows:

> Throughout our childhood, she worked 6 days a week. Sundays were a special day. Despite a very busy schedule, she always managed to be there with us. Now that we have kids of our own, we recognize that it certainly could not have been easy to do so as a working mother of four including twins. She was the kind of mom that checked our homework, managed our extracurricular activities, and never missed a dance recital. She encouraged us to focus on academics. It was through her example that we were inspired to become physicians ourselves. She had always been proud of her career and found a great sense of purpose to it.

Letter to the Hon. Ann M. Donnelly from Drs. Lisa and Linda Ratanaprasatporn.

Dr. Richard Ratanaprasatporn, the defendant's eldest child, in his letter to Your Honor, speaks to his mother's accomplishments as a physician before she began exhibiting symptoms of a mental decline:

> Throughout her career, she was a compassionate physician, often going above and beyond for her patients. For over 40 years, her commitment to her profession and her community of East New York reflects the values we hold dear as a family. Working in a local hospital, I have come across many of her former patients, who also commended her on her patient care. Her impact in the community resulted in several awards and acknowledgement by community leaders. Unfortunately, the field of medicine and its advancement, particularly the reliance on technology, has made her practice of medicine obsolete. She had to rely on others to compensate for her inability to efficiently navigate through these advancements, in particular electronic medical records and electronic prescriptions. Coupled with the fact that

her illness has altered her reality, affecting her cognitive abilities and her understanding of the events that have led us to this moment.

Letter to the Hon. Ann M. Donnelly from Dr. Richard Ratanaprasatporn.

Ratanaprasatporn's devotion to her profession and family was matched by her involvement in supporting the Thai community in New York. Her former daughter-in-law, Vivian Ng, notes the defendant's service to the members of this community in her letter to Your Honor:

> I know that Dr. Ratanaprasatporn found herself in a state of uncertainty about who she is following the loss of her husband. Grief challenges one's values, beliefs and priorities, and I believe she was trying to find herself through the process. She was always dedicated to her patients, answering medical calls and keeping her practice open late to accommodate the needs of her patients. Additionally, Dr. Ratanaprasatporn found her purpose in serving the Thai community as a widow. She was the president of the Thai American Society of New York, volunteering her time to build community, fundraise for underprivileged individuals, and support Buddhist temples in the New York area. Her involvement in the Thai community continues to be a passion for Dr. Ratanaprasatporn.

Letter to the Hon. Ann M. Donnelly from Vivian Ng.

The Sentence

As this Court needs no reminder, 18 U.S.C. § 3553(a) codifies the criteria to be employed in determining a fair and just sentence formally styled as "sufficient but no greater than necessary." Based on several factors set forth in § 3553(a), the Court has clear authority to depart or vary downward from the guidelines range should it choose .

Significantly, none of the factors in § 3553(a) militates against imposing a non-custodial sentence in this case. Two of the factors that the Court is required to take into account in determining Ratanaprasatporn's sentence are general and specific deterrence. The latter, we respectfully submit, is inapplicable here. Ratanaprasatporn has no prior criminal record and presents no risk of recidivism given her age and her voluntary suspension from the practice of medicine, which inevitably will be converted to a final revocation after her sentence. The concept of general deterrence is concededly more elusive to assess, all the more so given empirical studies that suggest it is of questionable validity. *See National Institute of Justice: Five Things About Deterrence*, U.S. Department of Justice, Office of Justice Programs (May 2016)*, available at* https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.

The more difficult issue to resolve is the concept of "just punishment" set forth in § 3553(a)(2)(A). The concept of "just punishment" under § 3553(a)(2)(A) refers to the need for a defendant's punishment to fit the crime. In the Senate Report accompanying the Sentencing Reform Act, the Act's sponsors explained:

> [Just punishment]—essentially the "just deserts" concept—should be reflected clearly in all sentences; it is another way of saying that the sentence should reflect

> the gravity of the defendant's conduct. From the public's standpoint, the sentence should be of a type and length that will adequately reflect, among other things, the harm done or threatened by the offense, and the public interest in preventing recurrence of the offense. From the defendant's standpoint the sentence should not be unreasonably harsh under all the circumstances of the case and should not differ substantially from the sentence given to another similarly situated defendant convicted of a similar offense under similar circumstances.

S. Rep. 98–225, 1984 U.S.C.C.A.N. 3182, 3258–59.

Here on one side of the scale is the jaw dropping number of oxycodone prescriptions issued over the course of several years by Smith using Ratanaprasatporn's DEA credentials. Balanced against it are the unassailable facts regarding the extraordinary lengths to which Smith went to conceal from Ratanaprasatporn her diversion of the prescriptions to illegal sales of the scripts to a network of co-conspirators. And while Ratanaprasatporn bears responsibility for her negligent supervision of Smith, which allowed Smith to dispense prescriptions without any oversight, the defendant's failure to exercise that responsibility must be viewed against the incontrovertible evidence of the decline in her mental faculties and her misplaced trust in an employee whom she had known for years. Taken together this unique set of facts sits well outside the heartland of similar prosecutions. *See, e.g.*, *United States v. Parasmo*, No. 19-cr-0001 (E.D.N.Y. May 25, 2023) (jury convicted physician of prescribing oxycodone without a medical purpose for writing prescriptions to patients he knew had just left rehab, had previously overdosed, and were addicted to other narcotics; court sentenced defendant to 36 months' imprisonment); *United States v. Adeglass*, No. 20-cr-0605 (S.D.N.Y. Mar. 9, 2023) (sentencing doctor who sold oxycodone prescriptions in exchange for cash, sex, and cocaine to 150 months' imprisonment).

Conclusion

For the reasons set forth above, the defense respectfully submits that a non-custodial sentence, conditioned on continued community service to the Thai American community of metropolitan New York, constitutes a fair and just sentence in this case.

Respectfully submitted,

COZEN O'CONNOR

/s/ *J. Bruce Maffeo*

BY:   J. BRUCE MAFFEO

JM

Cc:  all counsel (by ECF)
     USPO Alexandra M. Lohwasser (by email to: Alexandria_Lohwasser@nyep.uscourts.gov)